## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

**KINSALE INSURANCE COMPANY,**

    *Plaintiff,*

v.                                                    **Case No. 5:22-CV-0048-JKP**

**FLYIN' DIESEL PERFORMANCE &**
**OFFROAD, LLC, et al.,**

    *Defendants*.

## <u>MEMORANDUM OPINION AND ORDER</u>

Before the Court are two motions: (1) a Motion for Summary Judgment (ECF No. 29) filed by Defendants Flyin' Diesel Performance & Offroad, LLC ("Flyin' Diesel") and Ross M. Dunagan ("Dunagan") (collectively "Defendants")[1] and (2) Plaintiff's Motion for Summary Judgment (ECF No. 30). Both motions are fully briefed, *see* ECF Nos. 31, 32, 34, and 35, with evidentiary support,[2] and ready for ruling. After due consideration, the Court partially grants the motion filed by Defendants and denies Plaintiff's motion.

## I. BACKGROUND

On October 23, 2021, Flyin' Diesel hosted an event called Race Wars 2. *See* Orig. State Pet. (ECF No. 1-1) ¶ 16. During that event, an amateur drag racer who was "competing for a cash prize, lost control and careened into the invited spectators who were present at the end of [a] defectively barricaded raceway." *Id*. The accident resulted in fatalities and other injuries. *See id*. ¶¶

---

[1] The Court uses Defendants for ease of reference while recognizing that not all defendants have joined the motion. Although several defendants have yet to appear in this case, three defendants (1) Chance Jones, individually and on behalf of the Estate of D.I.T.J., (2) Delia Jones, individually and as next friend of J.D.J.; and (3) Mary Kate Walls, individually and as next friend of G.M.J. have specifically adopted the motion and briefing of Defendants Flyin' Diesel and Dunagan. *See* ECF No. 33.

[2] Defendants provide an affidavit of Dunagan as support for their motion. *See* Ex. 1, attached to ECF No. 29. Plaintiff has provided various evidence with its motion for summary judgment, *see* ECF No. 30-1 through 30-19, and relies on voluminous documents attached to its complaint, *see* ECF No. 30 at 2 n.1, 3 n.5 (referencing ECF Nos. 1-1, 1-2, and 1-3). In response to that motion, Defendants provide additional evidentiary support. *See* ECF No. 31 (attachments).

1. 16. On November 5, 2021, three individuals filed suit in state court (hereinafter "Underlying Lawsuit") seeking damages on their own behalf and that on behalf of the estates of two deceased spectators. *See id.* ¶ 1. Three days later, other individuals sought to intervene in that state action. *See* Intervenor's Orig. Pet. (ECF No. 1-2). In this Memorandum Opinion and Order, the Court will collectively refer to the plaintiffs in the original state action and the intervenors as "Underlying Plaintiffs."

On January 21, 2022, Kinsale Insurance Company ("Kinsale") commenced this federal action to seek a declaration of rights under the relevant insurance policy. *See* Compl. (ECF No. 1). Kinsale issued the relevant policy to Flyin' Diesel with an effective date of October 23, 2021, through October 24, 2021, at 12:01 AM. *See* ECF No. 1-3 (policy) at 2. The focus of this federal litigation is this policy with its various endorsements and exclusions. Kinsale contends the policy unambiguously excludes coverage. It asks the Court to grant it summary judgment and enter a declaration that the policy does not cover damages sought in the Underlying Lawsuit and that Kinsale does not have a duty to defend or indemnify against the underlying claims. ECF No. 30 at 18. It further seeks a declaration "that it has no obligation to indemnify the Underlying Plaintiffs in the Underlying Lawsuit, should those parties obtain a judgment in that proceeding." *Id.*

Defendants contend otherwise. They argue that "ambiguity is created by conflicts between the policy's endorsements." ECF No. 29 at 9. More particularly, they argue that "the language in each of the endorsements that states 'ALL OTHER TERMS AND CONDITIONS OF THE POL-ICY REMAIN UNCHANGED' creates a conflict between the endorsement that provides for coverage for the Race Wars 2 event and the endorsements that purport to eliminate coverage for it." *Id.* In addition, Defendants further argue that, under the Illusory Coverage Doctrine, coverage and thus a duty to defend exists. *Id.* at 13.

Defendants ask the Court to grant their motion and enter judgment in their favor. *Id.* at 17. They want the Court to declare that (1) Kinsale owes a duty to defend and a duty to indemnify

Flyin' Diesel and Dunagan in the underlying lawsuit; (2) the policy in question is ambiguous; and (3) the Illusory Coverage Doctrine requires that Kinsale provide a defense and indemnification. *Id*. They also seek an award of reasonable and necessary attorney's fees and costs of court. *Id*.

## II. APPLICABLE LAW

"Under the *Erie* doctrine, federal courts sitting in diversity apply state substantive law and federal procedural law." *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996); *accord Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). Because jurisdiction in this case is based on diversity of citizenship, *see* Compl. ¶ 9, the Court must "apply Texas law," *Ocwen Loan Servicing, LLC v. Berry*, 852 F.3d 469, 473 (5th Cir. 2017); *accord West v. Conrail*, 481 U.S. 35, 39 n.4 (1987).

No one disputes the applicability of Texas law to issues in this case. Texas law provides the "substantive law governing construction of contracts," *Nat'l Car Rental Sys., Inc. v. Better Monkey Grip Co.*, 511 F.2d 724, 729 (5th Cir. 1975); *accord AXO Staff Leasing, LLC v. Zurich Am. Ins. Co.*, No. A-19-CV-00002-LY, 2019 WL 4418539, at *4 (W.D. Tex. Sept. 16, 2019) (applying Texas law regarding the construction of contracts), including applicability of "the parol evidence rule, which is not really a rule of evidence but rather a substantive rule from the law of contracts," *Harville Rose Serv. v. Kellogg Co.*, 448 F.2d 1346, 1349 (5th Cir. 1971).

"When reviewing issues of state law, federal courts look to the law of that state's highest court." *City of Alexandria v. Brown*, 740 F.3d 339, 351 (5th Cir. 2014). Absent a final decision by the Texas Supreme Court that "'precisely' resolves the legal issue, federal courts "must make an *Erie* guess and determine as best [they] can what the Supreme Court of Texas would decide." *Martinez v. Walgreen Co.*, 935 F.3d 396, 398 (5th Cir. 2019) (citation omitted). When compelled to make an *Erie* guess, federal courts "defer to intermediate state appellate court decisions, unless convinced by other persuasive data that the highest court of the state would decide otherwise." *Mem'l Hermann Healthcare Sys. Inc. v. Eurocopter Deutschland, GMBH*, 524 F.3d 676, 678 (5th

3

Cir. 2008) (citations and internal quotation marks omitted). The federal courts not only look to the intermediate state appellate decisions, but also to "the general rule on the issue, decisions from other jurisdictions, and general policy concerns." *Martinez*, 935 F.3d at 398 (citation omitted).

### III. SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[3] Fed. R. Civ. P. 56(a). "As to materiality, the substantive law will identify which facts are material" and facts are "material" only if they "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over material facts qualify as "genuine" within the meaning of Rule 56 when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Given the required existence of a genuine dispute of material fact, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id.* at 247-48. A claim lacks a genuine dispute for trial when "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When seeking summary judgment on an affirmative defense, the movant "must establish beyond peradventure" each essential element of the defense. *Access Mediquip LLC v. UnitedHealthcare Ins. Co.*, 662 F.3d 376, 378 (5th Cir. 2011), *adhered to on reh'g en banc*, 698 F.3d 229 (5th Cir. 2012); *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986).

---

[3] The summary judgment standard "remains unchanged" despite 2010 amendments to Fed. R. Civ. P. 56 that replaced "issue" with "dispute." Fed. R. Civ. P. 56 advisory committee notes (2010 amend.). Although the standard remains the same, the Court utilizes the amended terminology even when relying on caselaw that predates the amendments.

When considering a motion for summary judgment, courts view all facts and reasonable inferences drawn from the record "in the light most favorable to the party opposing the motion." *Heinsohn v. Carabin & Shaw, P.C.*, 832 F.3d 224, 234 (5th Cir. 2016) (citation omitted). Once the movant has carried its summary judgment burden, the burden shifts to the non-movant to establish a genuine dispute of material fact. With this shifting burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "Unsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." *Heinsohn*, 832 F.3d at 234 (citation omitted). Additionally, the courts have "no duty to search the record for material fact issues." *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010); *accord Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012).

## IV. RELEVANT CONTRACT

The relevant contract is a standard commercial general liability insurance policy with a number of attached endorsements. *See*, *generally*, ECF No. 1-3. The contract comprises ninety-eight pages in its entirety, including all attachments. *See id.* at 2-99. While the contract often uses uppercase and bold font, the Court will ignore such emphasis in quoting contractual provisions.

The first page of the contract sets out the Commercial General Liability Declarations, including the policy number (0100166074-0); the insured (Flyin Diesel Performance & Offroad LLC); the insured's address (1994 Airport Loop; Kerrville, Texas 78028); the policy period (FROM 10/23/2021 TO 10/24/2021 at 12:01 AM at the address of the named insured as shown above); and various limits of insurance. *Id*. at 2. This opening page describes the business operations as a "Special Event" and classifies the insurance as for "Special Events" with the premium calculated on a "per Attendee" basis. *Id*. A two-page, "Schedule of Forms" identifies the associated contractual forms, including various endorsements and exclusions. *See id.* at 5-6.

A sixteen-page, Commercial General Liability Coverage Form sets out the body of the

relevant contract. *See id.* at 7-22. In general, covered matters are set out in Section I. *See id.* at 7-15. Coverage A addresses Bodily Injury and Property Damage Liability. *See id.* at 7. Coverage A provides in pertinent part:

> 1. Insuring Agreement
>
>> a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit that may result. But:
>>
>>> (1) The amount we will pay for damages is limited as described in Section III –Limits of Insurance; and
>>>
>>> (2) Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.
>>
>> No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages A and B
>>
>> b. This insurance applies to "bodily injury" and "property damage" only if:
>>
>>> (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";
>>>
>>> (2) The "bodily injury" or "property damage" occurs during the policy period; and
>>>
>>> (3) Prior to the policy period, no [insured or any relevant employee] knew that the "bodily injury" or "property damage" had occurred, in whole or in part. . . .

*Id.* As defined by the contract: "'Occurrence' means an accident, including continuous or repeated exposure to substantially the same general harmful conditions." *Id.* at 21.

Both sides recognize the Section I(1)(a) policy language. *See* ECF No. 29 at 7, ECF No. 30 at 4. Defendants submit that, when read in isolation, the language from the main body of the contract provides coverage for the type of claims made by the Underlying Plaintiffs and provides

6

a duty to defend those claims on the part of Kinsale. *See* ECF No. 29 at 7. While recognizing that

the policy contains "amendatory endorsements," Defendants argue that the contract as a whole is

ambiguous due to the various endorsements. *See id.* at 7-13. Kinsale, on the other hand, relies on

a number of exclusionary endorsements to argue that the contract unambiguously does not pro-

vide coverage as Defendants contend. *See* ECF No. 30 at 4, 8-15.

Notably, each endorsement includes the following header at the top of the page: "This

Endorsement Changes the Policy. Please Read It Carefully." *See, e.g.*, ECF No. 3-1 at 28 (Cov-

erage for Designated Events – Commercial General Liability); 49 (Exclusion – Absolute Auto,

Aircraft, and Watercraft),[4] 52 (added Exclusion – Athletic Participants); 60 (added Exclusion –

Seating, Grandstands and Bleachers); 69 (added Absolute Exclusion – Motorized Vehicles); 77

(added Exclusion – Traffic Control). And each provision concludes with "All Other Terms and

Conditions of the Policy Remain Unchanged." *See, e.g., id.* at 28, 49, 52, 60, 69, 77.

The parties entered into the entirety of the insurance contract at one specific point in time.

In other words, Kinsale generated all endorsements and exclusions simultaneously for inclusion

in the contract. This is not a case where anyone added one or more endorsements after the initial

contractual agreement.

Defendants argue that the contract is ambiguous based upon conflicting endorsements.

They primarily rely on an endorsement that specifically applies to an event identified as "Race

Wars 2." That provision, titled "Coverage for Designated Events – Commercial General Liabil-

ity" [hereinafter "CDE Endorsement"], modifies the Commercial General Liability Coverage

Form in two respects. *See* ECF No. 1-3 at 28. First it sets out a schedule for the Race Wars 2

---

[4] This exclusion replaces Section I(2)(g) of the contract and deletes Section IV(4)(b)(iv) regarding excess insurance. Subparagraph (g) excluded claims for bodily injury or property damage arising out of the use of any automobile "owned or operated by or rented or loaned to any insured." The facts of this case do not fall within the parameters of this original exclusion. *See* ECF No. 1-3 at 10. The endorsement exclusion for automobiles does not confine use to automobiles owned or operated by an insured or to automobiles rented or loaned to an insured. *See id.* at 49. The endorsement thus expands the exclusion.

7

event for October 23, 2021, at 1994 Airport Loop, Kerrville, Texas. *Id*. Second, it states:

> This insurance applies to "bodily injury", "property damage" or "personal and advertising injury" arising out of the ownership, maintenance or use of premises for the designated event(s) in the above Schedule, including any property located on these premises during the designated event(s).

*Id*.

## V. ANALYSIS – DUTY TO DEFEND

Texas applies an "eight-corners rule," also known as "the complaint-allegation" rule, which "provides that when an insured is sued by a third party, the liability insurer is to determine its duty to defend solely from terms of the policy and the pleadings of the third-party claimant." *GuideOne Elite Ins. Co. v. Fielder Rd. Baptist Church*, 197 S.W.3d 305, 306-07 (Tex. 2006). It is "generally prohibited" to "[r]esort to evidence outside the four corners of these two documents." *Id*. Under this rule, "an insurer's duty to defend is determined by the third-party plaintiff's pleadings, considered in light of the policy provisions, without regard to the truth or falsity of those allegations." *Id*. at 308.

"Facts outside the pleadings, even those easily ascertained, are ordinarily not material to the determination and allegations against the insured are liberally construed in favor of coverage." *Id*.

> Where the complaint does not state facts sufficient to clearly bring the case within or without the coverage, the general rule is that the insurer is obligated to defend if there is, potentially, a case under the complaint within the coverage of the policy. Stated differently, in case of doubt as to whether or not the allegations of a complaint against the insured state a cause of action within the coverage of a liability policy sufficient to compel the insurer to defend the action, such doubt will be resolved in insured's favor.

*Heyden Newport Chem. Corp. v. S. Gen. Ins. Co.*, 387 S.W.2d 22, 26 (Tex. 1965) (citation and internal quotation marks omitted). If the third-party plaintiff's pleading "does not allege facts within the scope of coverage, an insurer is not legally required to defend a suit against its insured." *Am. Physicians Ins. Exch. v. Garcia*, 876 S.W.2d 842, 848 (Tex. 1994). But a duty to defend arises

once the pleadings state allegations sufficient to state a claim within the scope of coverage under the relevant insurance policy. *See id*.

## A. Underlying Lawsuit

Here, neither side disputes the factual allegations of the Underlying Lawsuit. *Compare* ECF No. 29 at 2-3 *with* ECF No. 30 at 2-3, 7. Kinsale provides the following apt and sufficient summary:

> This is a coverage dispute arising out of an underlying tort lawsuit involving injuries that occurred when a vehicle lost control and collided with race spectators. . . .
>
> Underlying Plaintiffs assert that they suffered personal injuries, including fatalities, while attending an event called "Race Wars 2" sponsored, organized and run by Flyin' Diesel and Dunagan. These injuries allegedly occurred when a vehicle driven by Michael Gonzalez lost control and collided with race spectators, including Underlying Plaintiffs. The Underlying Lawsuit asserts that Flyin' Diesel and Dunagan acted negligently in a variety of ways . . ..

ECF No. 30 at 2-3. Plaintiff later provides a similar summary:

> The Underlying Lawsuit alleges injuries sustained by Underlying Plaintiffs after a car lost control and careened into spectators at a vehicle racing contest. Specifically, the Underlying Lawsuit alleges: "a 1990 Ford Mustang driven by Michael Gonzales and owned by Fernando Garza, who were competing for a cash prize, lost control and careened into the invited spectators who were present at the end of the defectively barricaded raceway."

*Id*. at 7. These summaries are consistent with the Original State Petition (ECF No. 1-1).

## B. Scope of Coverage

The parties, however, dispute the scope of coverage provided by the relevant insurance policy. Kinsale argues that the allegations of "the Underlying Lawsuit implicate several exclusions that preclude coverage: traffic control exclusion, use of auto exclusion, athletic and sporting events exclusion, seating, grandstands and bleachers exclusion and motorized vehicles exclusion." ECF No. 30 at 7. While recognizing that "Kinsale included a number of amendatory endorsements with the policy that appear to gut all coverage for anything that could possibly be associated with an event such as the Race Wars 2 event put on by Flyin' Diesel and Dunagan," Defendants point out that Kinsale also included "at least one endorsement that provides for coverage for the specific event in question – the Coverage for Designated Events – Commercial General Liability endorsement." ECF No. 29 at 6-8.

## C. Principles of Contract Interpretation

"Insurance policies are controlled by rules of interpretation and construction which are applicable

to contracts generally." *Nat'l Union Fire Ins. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995). "When a contract's meaning is disputed, [a court's] primary objective is to ascertain and give effect to the parties' intent as expressed in the instrument." *URI, Inc. v. Kleberg Cnty.*, 543 S.W.3d 755, 763 (Tex. 2018). Whether the parties agree or disagree as to the ambiguity or clearness of a contract is not determinative. *Id*. "Whether a contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present when the contract was entered." *Nat'l Union*, 907 S.W.2d at 520.

The Texas Supreme Court has recognized the following "well-settled contract-construction principles":

> Objective manifestations of intent control, not what one side or the other alleges they intended to say but did not. [Courts] therefore presume parties intend what the words of their contract say and interpret contract language according to its plain, ordinary, and generally accepted meaning unless the instrument directs otherwise.
>
> [Courts] are also cognizant that words are simply implements of communication, and imperfect ones at that. Oftentimes they cannot be assigned a rigid meaning, inherent in themselves. Rather, their meaning turns upon use, adaptation and context as they are employed to fit various and varying situations. Even a single word can carry subtle—and significant—differences in meaning when applied to different situations.
>
> Accordingly, to home in on the meaning the parties intended, [courts] have long allowed that words must be construed in the context in which they are used. Context is not, however, confined to the two-dimensional contractual environs in which the words exist but may also encompass the circumstances present when the contract was entered. This is so because words are the skin of a living thought, and our quest is to determine, objectively, what an ordinary person using those words under the circumstances in which they are used would understand them to mean.

*URI*, 543 S.W.3d at 763-64 (footnotes, citations, and internal quotation marks omitted).

Furthermore, whether courts may consider evidence "of surrounding circumstances is limited by the parol evidence rule, which prohibits a party to an integrated written contract from presenting extrinsic evidence for the purpose of creating an ambiguity or to give the contract a meaning different from that which its language imports." *Id*. at 764 (same). However, as the Texas Supreme Court has recognized, this prohibition does not prevent "courts from considering extrinsic

evidence of the facts and circumstances surrounding the contract's execution as an aid in the construction of the contract's language." *Id*. at 765 (same). However, such extrinsic "evidence may only give the words of a contract a meaning consistent with that to which they are reasonably susceptible, i.e., to interpret contractual terms." *Id*. (same). In short, "whether a court is considering if an ambiguity exists or construing the terms of an unambiguous contract, surrounding facts and circumstances can only provide context that elucidates the meaning of the words employed, and nothing else." *Id*.

Courts "examine the entire agreement and seek to harmonize and give effect to all provisions so that none will be meaningless." *Gilbert Tex. Const., LP v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 126 (Tex. 2010). "[N]o one phrase, sentence, or section [of a contract] should be isolated from its setting and considered apart from the other provisions." *Nassar v. Liberty Mut. Fire Ins. Co.*, 508 S.W.3d 254, 258 (Tex. 2017) (quoting *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 134 (Tex. 1994)). "Unless the policy dictates otherwise, [courts] give words and phrases their ordinary and generally accepted meaning, reading them in context and in light of the rules of grammar and common usage." *RSUI Indem. Co. v. The Lynd Co.*, 466 S.W.3d 113, 118 (Tex. 2015).

Under Texas law, a written contract is not ambiguous when it "is so worded that it can be given a definite or certain legal meaning . . . as applied to the matter in dispute." *URI*, 543 S.W.3d at 765. On the other hand, ambiguity exists under Texas law when "contract language is susceptible to more than one reasonable interpretation." *Id.* If the Court "determine[s] that only one party's interpretation of the insurance policy is reasonable, then the policy is unambiguous." *Nassar*, 508 S.W.3d at 258. With such determination, the Court should adopt that reasonable interpretation. *Id*. But, if the Court "determine[s] that both interpretations are reasonable, then the policy is ambiguous." *Id*.

In that event, "[courts] must resolve the uncertainty by adopting the construction

that most favors the insured," and [when] construing a limitation on coverage, [they] must do so "even if the construction urged by the insurer appears to be more reasonable or a more accurate reflection of the parties' intent."

*RSUI*, 466 S.W.3d at 118 (quoting *Nat'l Union Fire Ins. Co. v. Hudson Energy Co.*, 811 S.W.2d 552, 555 (Tex. 1991)).

"'Endorsements to a policy generally supersede and control over conflicting printed terms within the main policy;' however, the provisions found in the main 'policy and endorsement should be construed together unless' doing so would negate or render superfluous the additional coverage afforded in the endorsement." *Mid-Continent Cas. Co. v. Bay Rock Operating Co.*, 614 F.3d 105, 115 (5th Cir. 2010) (quoting *Mesa Operating Co. v. Cal. Union Ins. Co.*, 986 S.W.2d 749, 754-55 (Tex. App. – Dallas 1999, pet. denied)). Not only does it make sense that "subsequent conflicting endorsements supersede the master policies with which they conflict," but it also makes sense for a later endorsement to take precedence over an earlier endorsement. *INA of Tex. v. Leonard*, 714 S.W.2d 414, 416-17 (Tex. App. – San Antonio 1986, writ ref'd n.r.e.). It "makes no difference" to a court's analysis that a case "involves conflicting endorsements" rather than a conflict "between the initial insurance policy" and a later endorsement. *Id.*

> It is settled law in Texas that [courts] must construe insurance policies in favor of the insured when ambiguity exists, and [they] must strictly construe exceptions and words of limitation in favor of the insured. If there are repugnant conditions in a policy [courts] must interpret the contract in favor of the insured to prevent forfeiture, defeat, or diminution of coverage if possible. This holds true even if the insurer's position appears to be more reasonable than the one offered by the insured.

*Id.* at 417.

In short, when conflicting endorsements make the policy ambiguous, courts "must adopt the reasonable interpretation of the policies that favors coverage." *Pogo Res., LLC v. St. Paul Fire & Marine Ins. Co.*, No. 3:19-CV-2682-BH, 2022 WL 209276, at *15 (N.D. Tex. Jan. 24, 2022) (citing *Leonard* with parenthetical that it "resolv[ed] ambiguity between conflicting endorsements in favor of insured, [when] one endorsement excluded coverage and a subsequent endorsement

provided coverage"). When "the court finds an ambiguity in the contract provisions, particularly in an exclusion clause, the court should construe the policy strictly against the insurer." *Valmont Energy Steel, Inc. v. Commercial Union Ins. Co.*, 359 F.3d 770, 774 (5th Cir. 2004). Stated succinctly, "when the language of an insurance contract is ambiguous, that is, is subject to two or more reasonable interpretations, then that construction which affords coverage will be the one adopted." *Glover v. Nat'l Ins. Underwriters*, 545 S.W.2d 755, 761 (Tex. 1977). Thus, when "an endorsement narrowing coverage creates ambiguity by conflicting with an endorsement expanding coverage, the construction that affords coverage to the insured governs." *Pogo*, 2022 WL 209276, at *15.

### D. Application of Legal Principles to this Case

Nothing in *Pogo* indicates that any contract provision, exclusion, or endorsement came into existence after the issuance of the policy in question. To the contrary, it appears that, like here, the main or master policy and all endorsements were issued simultaneously. The main policy here specifically says in its initial coverage provision that Kinsale "will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies" and that it has a "duty to defend the insurer against any 'suit' seeking those damages." ECF No. 1-3 at 7. The main policy then goes on to state that it "applies to 'bodily injury' or 'property damage' only if" caused by an occurrence in the coverage territory during the policy period and there was no known pre-existing injury or damage that would preclude coverage. *Id.* The facts warrant none of those exceptions in this case. Further, although the main policy also includes an exclusion for use of any auto "owned or operated by or rented or loaned to any insured," *see id.* at 10, the facts of this case do not invoke this original exclusion.

Kinsale, furthermore, replaced the auto exclusion of the main policy with an endorsement that expands the exclusion by eliminating the quoted language above. *See id.* at 49. Kinsale also added exclusions for athletic participants; seating, grandstands, and bleachers; and traffic control.

13

*See id*. at 52, 60, 77. It further added an absolute exclusion for motorized vehicles. *See id*. at 69. In addition to the replaced and additional exclusions, it also included the CDE Endorsement to modify the main policy. *See id*. at 28. This latter endorsement modifies the main policy, not by replacing any provision or even expressly adding to the main policy, but by (1) setting out a schedule for the Race Wars 2 event for October 23, 2021, at 1994 Airport Loop, Kerrville, Texas" and (2) providing new language as to circumstances making the policy applicable. *Id*. Although the Court has quoted the new language in full before, the language is crucial enough to warrant another full quotation:

> This insurance applies to "bodily injury", "property damage" or "personal and advertising injury" arising out of the ownership, maintenance or use of premises for the designated event(s) in the above Schedule, including any property located on these premises during the designated event(s).

*Id*. Each endorsement purports to leave "[a]ll other terms and conditions of the policy" unchanged. *See id*. 28, 49, 52, 60, 69, 72, and 77.

Defendants argue that the main policy – without reference to any endorsement – is sufficient of itself to provide coverage for the Race Wars 2 event. ECF No. 29 at 7, 9. Kinsale, on the other hand, argues that several exclusionary endorsements preclude coverage. *See* ECF No. 30 at 7. From these arguments, the Court discerns no disagreement that Defendants would have coverage for the claims asserted in the Underlying Litigation absent exclusionary endorsements.

Furthermore, absent other endorsements, the CDE Endorsement provides coverage for the Race Wars 2 event. This conclusion not only flows naturally from the principle that endorsements supersede the main policy to the extent they conflict, but in this instance, the main policy itself provides coverage. Nevertheless, as both sides recognize, the relevant insurance policy contains numerous other endorsements that could affect that coverage. And Kinsale argues that multiple endorsements exclude coverage for the matters at issue in the Underlying Lawsuit while leaving insurance coverage for claims not presented by that lawsuit.

Defendants agree that endorsements indeed "appear to eliminate coverage for virtually everything that could occur at an even[t] such as Race Wars 2," but they point out that the CDE endorsement specifically "provides for coverage for the specific event in question." ECF No. 29 at 7-8. They argue that the conflict between the exclusionary endorsements and the CDE endorsement makes the policy ambiguous. *See id.* at 8. Using the endorsement labeled, "Absolute Exclusion – Motorized Vehicles," Defendants point out directly contradictory language from the CDE Endorsement. ECF No. 29 at 9. That exclusion states in pertinent part:

> This insurance does not apply to any claim or "suit" for "bodily injury", "property damage" or "personal and advertising injury" arising directly or indirectly out of, related to, or, in any way involving the operation, maintenance, use, entrustment to others, or "loading or unloading" of any motorized vehicle of any type.

ECF No. 1-3 at 69. Because all endorsements include the statement that "All Other Terms and Conditions of the Policy Remain Unchanged," Defendants argue that the exclusionary endorsements directly conflict with the CDE Endorsement providing for coverage for the designated event. ECF No. 29 at 9. Relatedly, Defendants assert that the Illusory Coverage Doctrine applies and provides coverage. *Id.* at 13-16.

Kinsale responds that "the policy is not illusory – it covers certain accidents, just not this one." ECF No. 32 at 2. It argues that "there are many instances in which the policy at issue would provide coverage; for example: a trip and fall accident, someone choking on a piece of popcorn or a metal detector at the entrance falling on a guest." *Id.* at 6. For ease of reference, the Court will refer to these examples as "example claims."

In reply, Defendants contend that the "argument ignores the complete exclusionary language found in at least one of the exclusions," namely the exclusion addressing Athletic Participants. ECF No. 34 at 3. That exclusion states in pertinent part:

> This insurance does not apply to any claim or "suit" for "bodily injury", "property damage" or "personal and advertising injury" arising directly or indirectly out of, related to, or, in any way involving any preparation, practice, or training for or participation in any contest, exhibition, exercise, activity or event of an athletic or

> sports nature by any person.
>
> This exclusion applies to any claim or "suit" regardless of whether the excluded activity is the initial precipitating cause or is in any way a cause, and regardless of whether any other actual or alleged cause contributed concurrently, proximately, or in any sequence, including whether any actual or alleged "bodily injury", "property damage" or "personal and advertising injury" arises out of a chain of events that includes any excluded activity.

ECF No. 1-3 at 52.

As Defendants point out, "Race Wars 2 was undeniably a 'contest'" within the meaning of this exclusion. ECF No. 34 at 4. They argue that this endorsement excludes "anything 'arising directly or indirectly out of' Race Wars 2." *Id*. This argument seems to arise from Kinsale's position that "[a]s the Underlying Plaintiffs seek damages for bodily injury arising out of, related to, or in any way involving a contest of an athletic or sports nature, the athletic and sporting events exclusion applies to bar coverage." *See* ECF No. 30 at 12. In light of Kinsale's position, Defendants' argument has more force. Still, the first paragraph of the exclusion certainly does not support the argument. And, while the second paragraph contains additional broad language, the Court finds Defendants' interpretation unreasonable even with Kinsale's own broad interpretation. Even if the Court were to accept that this exclusion somehow applies to spectators, it is unreasonable to interpret the provision as excluding all claims by spectators for the example claims.

Although Defendants fail to show that the primary language of the Athletic Participation exclusion completely excludes all claims for damages and injuries from the Race Wars 2 event, they also argue that taken together, the combination of exclusionary endorsements eliminates all coverage for the event in question and creates illusory coverage. *See* ECF No. 29 at 16. In support, they rely on the following exclusions: (1) Injury to Volunteers; (2) Absolute Auto, Aircraft and Watercraft; (3) Athletic Participation; (4) Seating, Grandstands, and Bleachers; (5) Motorized Vehicles; and (6) Traffic Control. *Id*. (citing ECF No. 1-3 at 48, 49, 52, 60, 69, 77). In addition, they argue that "the 'all other terms and conditions remain the same' language in all of the endorsements

creates ambiguity in the policy because it creates conflict between multiple, simultaneously effective endorsements." ECF No. 31 at 3; accord ECF No. 29 at 7-9. The Court need not delve into each claim of ambiguity. Nor does it need to precisely determine whether all coverage would be excluded under the exclusionary endorsements.

Simply stated, the Court's task is to interpret the insurance policy and determine whether it is unambiguous. This entails determining whether Defendants' "interpretation is reasonable," and if so, then the Court must adopt that reasonable interpretation "even if" Kinsale's "interpretation is also, or more, reasonable." *Nassar v. Liberty Mut. Fire Ins. Co.*, 508 S.W.3d 254, 258 (Tex. 2017). For the reasons that follow, the Court agrees that under the circumstances of this case, the standard language found at the bottom of each endorsement creates ambiguity.

First, taken alone, the main policy provides coverage for the claims asserted in the Underlying Lawsuit. So that begs the question as to the purpose or need for the CDE Endorsement. If that endorsement merely adds a coverage provision without changing any other term or condition of the policy, then the endorsement serves no purpose. And, if simultaneously created endorsements each state that all other terms and conditions of the policy remain unchanged, then an added coverage provision would be unchanged by an added exclusionary endorsement. This result also occurs when an endorsement, like the CDE Endorsement, is temporally added after the main policy and other endorsements. This is so, because the later endorsement would supersede prior conflicting language of the main policy and prior endorsements.

Of course, had Kinsale added a conflicting endorsement after the Coverage for Designated Events, Kinsale could make the argument that the later endorsement supersedes and applies notwithstanding the Coverage for Designated Events. But those are not the facts here. The entirety of the insurance policy at issue here came into existence at the same time. For Kinsale to avail itself of that argument there must be a temporal gap between the issuance of the Coverage for Designated Events and a later endorsement. When the main policy and all endorsements come together at the

same time, there is no basis for arguing that one endorsement supersedes the others. There is thus no basis to favor one endorsement over another one. Nevertheless, when conflicting endorsements create ambiguity in such circumstances, the courts construe the policy in favor of coverage.

Defendants argue that ambiguity exists because the CDE Endorsement provides coverage for the Race Wars 2 event while other simultaneously created exclusions eliminate or change that coverage despite contractual language stating that all other terms and conditions remain unchanged. Kinsale essentially argues that the CDE Endorsement is simply subject to the simultaneously created exclusions and there is no conflict or ambiguity because, in their view, some coverage remains, i.e., for the previously identified example claims.

To the extent some coverage remains under the CDE Endorsement, Kinsale's interpretation appears reasonable even though Kinsale does not provide a reasonable basis for adding the CDE Endorsement when the main policy would cover each of the identified example claims without the additional coverage. Still, under the circumstances, the Court finds Kinsale's interpretation reasonable. Regardless of such reasonableness, however, the Court also finds Defendants' interpretation reasonable. Because both interpretations are reasonable, the policy is ambiguous.

The simultaneously created endorsements make the policy ambiguous by creating uncertainty as to the scope of coverage provided by the CDE Endorsement in light of exclusionary endorsements. With each endorsement stating that all other terms and conditions of the policy remain unchanged, it is unclear that each of them or any of them apply to the CDE Endorsement. To the extent the exclusionary endorsements apply to the CDE Endorsement, some exclusions are in direct conflict with the CDE Endorsement. Kinsale could have avoided the conflict and ambiguity by carefully drafting the policy. For instance, Kinsale could have included language to the CDE Endorsement to specify that the coverage was subject to certain listed exclusions. Or it could have specified in the exclusionary endorsements that they each alter the coverage provided in the CDE Endorsement. Instead, Kinsale drafted the policy in a manner creating ambiguity.

Given that ambiguity, the Court must construe the policy in favor of the insured. Although the courts endeavor to interpret insurance policies to give effect to every provision, the inclusion of conflicting endorsements at the same moment in time creates ambiguity in this case. Defendants procured a one-day insurance policy to specifically cover a Race Wars 2 event. *See* ECF No. 1-3 at 28. The nature of the event was no secret to either party. The exclusionary endorsements severely limit or eliminate this coverage even though the CDE Endorsement and the exclusionary endorsements all state that all other terms and conditions of the policy remain unchanged. If the exclusions apply to the CDE Endorsement, they would largely or completely eliminate the purported coverage of that endorsement.

Because the interpretation urged by Defendants is reasonable, the Court adopts that interpretation. With that interpretation, the policy provides coverage and Kinsale has a duty to defend.

## VI. ANALYSIS – DUTY TO INDEMNIFY

Texas recognizes that the duties to defend and indemnify are "distinct and separate." *Trinity Universal Ins. Co. v. Cowan*, 945 S.W.2d 819, 821-22 (Tex. 1997). An insurer has a duty to defend when a lawsuit against an insured "alleges and seeks damages for an event potentially covered by the policy, even if groundless, false or fraudulent." *D.R. Horton–Tex., Ltd. v. Markel Int'l Ins. Co.*, 300 S.W.3d 740, 743 (Tex. 2009) (citation omitted). Whereas the duty to indemnify is "to pay all covered claims and judgments against an insured." *Id.* (citation omitted). "The difference between the two is a matter of timing." *Colony Ins. Co. v. Peachtree Const., Ltd.*, 647 F.3d 248, 252-53 (5th Cir. 2011). The duty to defend arises at the outset of litigation while the duty to indemnify occurs after resolution of the claims asserted.

An insurance company's duty to indemnify is not governed by the factual allegations of the underlying state petition, but by facts established in that action. *See Century Sur. Co. v. Seidel*, 893 F.3d 328, 336 (5th Cir. 2018). "Thus, an insurer's duty to indemnify typically can be resolved only after the conclusion of the underlying action." *VRV Dev. LP v. Mid–Continent Cas. Co.*, 630

F.3d 451, 459 (5th Cir. 2011). That general rule subsides, however, "when 'the insurer has no duty to defend and the same reasons that negate the duty to defend likewise negate any possibility the insurer will ever have a duty to indemnify.'" *Id*. (quoting *Farmers Tex. Cnty. Mut. Ins. Co. v. Griffin*, 955 S.W.2d 81, 84 (Tex. 1997) (emphasis omitted)). In those circumstances, courts may resolve the duty to indemnify at summary judgment. *Id*. Although some courts have noted that "the duty to defend is broader than the duty to indemnify," that does not mean that "there can be no duty to indemnify absent a duty to defend." *Colony Ins. Co. v. Peachtree Const., Ltd.*, 647 F.3d 248, 253 (5th Cir. 2011).

In this case, the Court has found a duty to defend. And, based on the cited authorities, it is premature to make any declaration regarding the duty to indemnify. Consequently, the Court denies Defendants' motion to the extent they seek a declaration regarding the duty to indemnify.

## VII. ATTORNEY FEES AND COSTS

Defendants also seek their attorney fees and costs in defending this action. *See* ECF No. 29 at 17. Rule 54(d) of the Federal Rules of Civil Procedure govern costs and attorney's fees. Consistent with Rule 54(d)(1) the Court will award costs other than attorney's fees to Defendants upon the filing of a Bill of Costs in the form required by the Clerk of Court within fourteen days of the judgment. To obtain attorney fees, Defendants must present their claim by motion. Accordingly, the Court denies the request at this time.

## VIII. CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART AND DENIES IN PART** the Motion for Summary Judgment (ECF No. 29) filed by Defendants and **DENIES** Plaintiff's Motion for Summary Judgment (ECF No. 30). The Court grants Defendants' motion for summary judgment to the extent they seek a declaration that (1) Plaintiff owes a duty to defend in the underlying lawsuit and (2) the insurance policy in question is ambiguous. The Court otherwise denies both motions. The denial of Defendants' motion is without prejudice to Defendants filing a timely

motion for attorney fees under Fed. R. Civ. P. 54(d)(2).

Because the rulings in this case inure to the benefit of the nonmovant defendants, the Court intends to grant summary judgment for all defendants, even those who have not moved for summary judgment. To provide all parties with notice and an opportunity to respond in accordance with Fed. R. Civ. P. 56(f), the Court will withhold entry of such final judgment for fourteen days. Unless a party provides a valid reason within that fourteen-day period as to why the Court should not grant summary judgment for the nonmovants, the final judgment will include all parties. The Final Judgment will grant summary judgment to Defendants, dismiss this action, award costs to Defendants, and declare that (1) Plaintiff owes a duty to defend in the underlying lawsuit and (2) the insurance policy in question is ambiguous.

**IT is so ORDERED.**

**SIGNED this 31st day of March 2023.**

**JASON PULLIAM**
**UNITED STATES DISTRICT JUDGE**